IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ORANGEBURG DIVISION

| | |
|---|---|
| LLOYD D. MYERS, | ) Civil Action No. 5:06-3169-RBH-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| SARA LEE CORPORATION; AND | ) |
| EARTH GRAINS BAKING COMPANIES, INC., | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Defendants. | ) |
| | ) |

Plaintiff, Lloyd Donnell ("Don") Myers ("Myers") filed this action on November 8, 2006. He alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("§ 1981").[1] Defendants, Sara Lee Corporation ("Sara Lee") and EarthGrains Baking Companies, Inc. ("EarthGrains"), filed a motion for summary judgment on November 15, 2007. Myers filed a memorandum in opposition to summary judgment on December 21, 2007. Defendants filed a reply on January 7, 2008.

SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard

of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).

## FACTS

1. Myers, a black male, was hired by EarthGrains in October 1996. He initially worked at the facility as a temporary employee before being hired as a full-time employee. Myers was employed as a sanitor in the Sanitation Department. His job involved cleaning duties which took him all over the facility, but he was primarily assigned to an area containing slicers, the machines used to cut whole loaves of bread into slices prior to packing. Plaintiff's Dep. 12, 17-18.

2. David Maxwell ("Maxwell"), a white male, was the plant manager of the Orangeburg facility from the late 1990s until April 2004. Maxwell Aff., Para. 1; Defendants' Motion for Summary Judgment at 5.

3. In September 2001, Sara Lee purchased and began operating the EarthGrains facility, but did not begin managing the facility until approximately two years later. Defendants' Motion for Summary Judgment 1-2, 6; see Van Curen Dep. 66-68.

4. Freager Sanders ("Sanders"), a black male, was employed as the plant manager of Sara Lee's Orangeburg baking facility from October 25, 2004 until June 10, 2006. Sanders Aff., Para. 1. See Defendants' Motion for Summary Judgment at 6.

5.  Karen Van Curen ("Van Curen"),[2] was Defendants' Human Resource Director for the Orangeburg facility during the time period relevant to this action. See Van Curen Dep. 6; Sanders Aff., Para. 4.

6.  When Myers began working at EarthGrains, he attended an employee orientation and was provided with an employee handbook. On March 2, 2004, Myers signed an acknowledgment that he received a new employee handbook from Sara Lee. Plaintiff's Dep. 12-14, Defendants' Exs. 1-2.

7.  The Sara Lee handbook contains a section titled "Workplace Violence" which provides:

    > We are committed to a workplace that is free of intimidation, violence and threats. While no workplace can be free of minor disputes and disagreements, we will not tolerate acts or threatened acts of violence by employees against fellow employees.
    >
    > **Anyone who violates this policy is subject to disciplinary action up to and including immediate discharge.**
    >
    > If you have a complaint or are aware of conduct which might constitute workplace violence, please report it immediately to your Plant Manager, Zone V. P. or Local Human Resource representative. We will investigate all such allegations and take appropriate action.[3]

---

[2] The parties have not identified Van Curen's race.

[3] Sara Lee has also submitted a copy of a Human Resources Policy titled "Workplace Violence" which provides:

POLICY

The Sara Lee Bakery Group is committed to providing its employees with a workplace that is free of intimidation, violence and threats of violence. While no workplace can be free of minor disputes and disagreements, the Company will not tolerate acts or threatened acts of violence by employees against fellow employees. Examples of prohibited acts or conduct include, but are not limited to, physically striking or attacking another employee with intent to do bodily harm, possession of any kind of weapon on company property, displaying any kind of weapon or verbally or physically threatening an employee with bodily harm.

(continued...)

4

        Plaintiff's Dep., Defendants' Ex. 2 (Sara Lee Non-Union Hourly Employee Handbook)(emphasis added).

8. There is also an addendum to the Sara Lee employee handbook which contains the company's "Code of Conduct." This provides that some behaviors are so serious that an employee may be subject to immediate discipline, up to and including termination. Such behavior includes "[b]eing insubordinate to, or not following the instructions of a supervisor." Plaintiff's Dep., Defendants' Ex. 2.

9. On January 29, 2002, Plaintiff was disciplined by William Daff ("Daff"), his "lead man" or supervisor at the time, for not completing his "detail work" at the end of his shift as required by Daff. Plaintiff's Dep. 18-19, Defendants' Ex. 3.[4]

---

[3](...continued)

**Anyone who violates this policy is subject to disciplinary action up to and including immediate discharge.**

PROCEDURE

Any employee who has a complaint of workplace violence or who is aware of conduct which might constitute workplace violence should report it immediately to his/her Plant Manager, Zone Vice President, or local Human Resource representative. The Company will promptly investigate all such allegations and take appropriate action.

No employee will be subject to retaliation or discipline as a result of reporting an act of workplace violence. Disciplinary action up to and including discharge will, however, be taken against employees who knowingly make a false, merit-less or malicious report under this policy.

Attachment to Sanders Aff. (emphasis added).

[4]Plaintiff initially testified that he never received any disciplinary action for work performance issues. Sara Lee, however, has provided written documentation of disciplinary actions. Further, Myers testified that it was his signature on the "Written Disciplinary Action" dated September 24, 2002, and then admitted that he recalled that incident (although he disagreed that he was entirely at fault). Plaintiff's Dep. at 19-20.

10. On September 24, 2002, Myers was disciplined by Daff again for work performance issues. He received a written warning for not cleaning the machines in his area properly. Myers was warned that if performance problems persisted, he would be given a performance improvement plan. Plaintiff's Dep. 19-20, Ex. 4.

11. Willie "Al" Jones ("Jones"), a black male, was Plaintiff's direct supervisor beginning in 2004. See Plaintiff's Dep. 22.

12. On July 3, 2004, Jones disciplined Myers for "Performance/Work quality" issues. Jones wrote on the disciplinary form that "[o]n 7-3-04 Don did not complete his assigned tasks on the variety wrap area. Don did not clean up all the trash and old bread from under [the number] one and two upstackers." Myers was warned that he needed to immediately show improvement on completing his assigned work and he would be given a written warning if performance problems continued. Myers denies ever seeing the document, but it was signed and witnessed that he refused to sign the form. Plaintiff's Dep. 20, Defendants' Ex. 5.

13. On June 28, 2005, an incident between Myers and Jones occurred, which resulted in the termination of both employees.

14. At approximately 9:00 a.m., Myers was taking the margin (scrap pieces of bread) to the dump site, when another employee asked him for a dust mop. At that time, Jones stopped by and asked to speak with Myers. Plaintiff's Dep. 27-28, 31.[5]

---

[5] In his affidavit, Myers states that this occurred around 9:30 a.m. Myers Aff., Para. 3.

15.    Myers and Jones went to the sanitation office. A discussion about Myers' work ensued. Jones told Myers to clean his area. Myers thought the area was clean and told Jones that he was about to go on break.[6]  Plaintiff's Aff., Para. 7; Plaintiff's Dep. 27-28.

16.    Myers and Jones walked to Myers' work area to discuss whether the area was clean. See Plaintiff's Dep. 30.

17.    While at Myers' work area, Jones spoke to Myers in what Myers perceived as an unprofessional manner. Plaintiff's Aff., Para. 7; Plaintiff's Dep. 31-32.

18.    Myers told Jones not to yell at him like a child. Plaintiff's Dep. 32, 35.[7]

19.    The parties agree that Jones pushed Myers, but disagree as to the circumstances.

20.    Jones states that Myers got into his personal space, Myers got into his face, Myers told him that he was tired of him, and Myers threatened to "kick his ass." Additionally, Jones claims he felt physically threatened and responded by pushing Myers in the chest to remove Myers from his personal space. See Sanders Aff. 5, Van Curen Dep., Ex. 6 (Jones' June 28, 2005 Statement).

21.    Myers testified that he backed away from Jones and Jones shoved him in his chest. Plaintiff's Dep. 33. In his affidavit, Myers states that Jones shoved him with both hands on his chest which caused him to fall backwards. Plaintiff's Aff., Para. 9. Myers also states that he did not violate Jones' space, Jones was moving toward Myers, Myers did not retreat,

---

[6]Myers testified that his break was at nine o'clock, he did not need to get permission to go on break, and he normally took break at different times. Plaintiff's Dep. 28.

[7]In his affidavit, Myers states that he told Jones that he was "not his child." Plaintiff Aff., Paras. 8-9.

7

      Myers had his back to the wall, Myers could not have retreated any further, and Myers was "basically cornered up against the wall." Plaintiff's Aff., Para. 17.[8]

22. After the push, Myers and Jones went to Van Curen's office. Plaintiff's Dep. 37; Plaintiff's Aff., Para. 10.

23. Myers also reported the incident to Sanders. Sanders Aff., Para. 4.

24. Van Curen and Sanders took statements from Jones and Myers, as well as other employees regarding the incident. Sanders Aff., Paras. 6-7; <u>see</u> Plaintiff's Dep. 37-38, 40, Ex. 6.

25. In a letter to Myers dated June 30, 2005, Van Curen wrote that Myers was terminated, effective that day. The letter was copied to Sanders. Van Curen wrote:

> As the company policy relates specifically to your actions, your work performance is not acceptable. Our investigation reveals that you are in direct violation of the workplace violence policy. The specific violation was stepping into the personal space of another employee and yelling. This act was sufficient to create a threatening/hostile environment for the other employee. These behaviors also constitute insubordination to your supervisor.

Plaintiff's Dep., Defendants' Ex. 7.

26. Van Curen and Sanders met with Myers and informed him of his termination. Sanders Aff., Para. 12.

27. Sanders and Van Curen also determined that Jones violated the Workplace Violence Policy. Jones was terminated on July 1, 2005. Sanders Aff., Para. 8; Van Curen Dep., Plaintiff's Ex. 6.

---

[8] In his memorandum in opposition to summary judgment, Plaintiff claims that Jones knocked him back two or three feet. Plaintiff's Opp. Mem. at 1 and 3.

DISCUSSION

Myers alleges that he was discharged and subjected to disparate discipline based on his race in violation of Title VII and § 1981.[9] In their motion for summary judgment, Defendants appear to have only analyzed Myers' claims as a discriminatory discharge claim. In his opposition memorandum, Myers only addresses his claims as a disparate discipline claim. In their reply, Defendants contend that the discriminatory discharge framework is the appropriate tool to analyze Myers' claims, but that regardless of the standard applied (discriminatory discharge or disparate discipline), Myers has not established a prima facie case of discrimination.

A.     Disparate Discipline Claim

Myers alleges that he was subjected to disparate discipline based on his race. Specifically, Myers claims that a white employee, James Van Dunn ("Dunn"), engaged in misconduct that was at least as serious as his own, but Myers was disciplined more severely. Defendants contend that Myers fails to establish a prima facie case of disparate discipline; they have articulated legitimate, non-discriminatory reasons for its actions; and Myers fails to show that these reasons are pretextual.

In the absence of direct proof of a defendant's intent to discriminate, a plaintiff can employ the scheme outlined in McDonnell Douglas to establish a prima facie case of disparate discipline by offering proof that:

(1) he is a member of a protected class under Title VII;

---

[9] The standard for establishing claims of employment discrimination under either Title VII or §1981 is the same. See Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1285-86 (4th Cir. 1985). Therefore, the analysis that follows, though couched in terms of Title VII, applies equally to Myers' § 1981 claims.

>   (2) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and
>
>   (3) he suffered more severe discipline for his misconduct as compared to those employees outside the protected class.

See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir.), cert. denied, 472 U.S. 1021 (1985). If the plaintiff establishes his prima facie case, the burden then shifts to the defendant to provide a legitimate, non-discriminatory explanation for its decision. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). Once such a neutral reason is proffered, the burden reverts to the plaintiff to establish that the employer's non-discriminatory rationale is a pretext for intentional discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).[10]

On September 1, 2003, Dunn, an hourly engineering employee (employed as a maintenance man) had a verbal argument with Mike Fralix ("Fralix"), another hourly engineering employee. See Dunn Dep. at 6. Fralix claimed that Dunn accused him of hiding Dunn's timecard and threatened him. Specifically, Fralix alleged that Dunn threatened to cut Fralix's "throat from ear to ear and watch [Fralix] bleed to death and enjoy sitting in prison for it." Additionally, Fralix claimed that Dunn bragged that he previously cut another employee at work.[11] Van Curen Dep., Plaintiff's Ex.

---

[10] The disparate disciplinary scheme is typically invoked where the plaintiff employee has been disciplined for an act of misconduct outside the realm of merely poor job performance. See Forrest v. Transit Mgmt. of Charlotte, Inc., 245 Fed. Appx. 255 (4th Cir. 2007) (employee disciplined for a physical altercation with a coworker); Moore, 754 F.2d 1100 (police officer demoted for fixing tickets); Jenks v. City of Greensboro, 495 F. Supp. 2d 524 (M.D.N.C. 2007) (firefighter terminated because she assaulted a civilian).

[11] Approximately twenty years before, while employed by Palmetto Baking Company (a private corporation that used to be located where the Sara Lee Orangeburg baking facility is now located), Dunn was involved in an altercation with an employee named Marion Logwood
(continued...)

10

2 (Investigation of Workplace Violence Complaint - Fralix Statement). Dunn testified that he threatened to cut Fralix's throat because he thought that Fralix had been tampering with or taking his timecard, but did not say anything about "ear to ear" or "going to prison and enjoying it." See Dunn Aff., Para. 4; Dunn Dep. 15, 18. At the time of the incident, Dunn (as did all maintenance employees including Fralix) carried a pocketknife that was needed for certain work at the plant. The knife remained in Dunn's pocket and he did not display it or use it. Dunn Dep. 14; Dunn Aff., Para. 4.

Fralix reported the incident to Human Resources and Van Curen conducted an investigation. Van Curen states that her role was to gather data and submit it to Maurice Evans, the Human Resources Director for the Southeast Region. Van Curen Dep. 9. Maxwell and Van Curen believed that Fralix embellished or exaggerated the incident. Maxwell Aff., Para. 7; Van Curen Dep. 28.

Dunn was found to be in violation of the Workplace Violence Policy. He was suspended without pay for three days, and was required to attend anger management sessions. On September 8, 2003, a Positive Discipline Program form was signed by Dunn, his Department Manager, and Van Curen. It provided that the level of discipline was verbal counseling, Dunn received a three day suspension without pay, and he was required to attend anger management counseling sessions. Dunn was warned that failure to attend any scheduled session or future acts of that nature would result in termination. Van Curen Dep., Plaintiff's Ex. 2 (Positive Discipline Program form); see also Dunn Aff., Para. 6.

---

[11](...continued)
("Logwood"). During the altercation, Dunn cut Logwood's shirt. Dunn states that he was verbally counseled by his supervisor, named Roy (last name unknown). He also states that at the time of the Logwood incident there was no Workplace Violence Policy and Maxwell was not the plant manager. See Dunn Aff., Paras. 2 and 7.

(1)     Prima Facie Case

Myers contends that he has established a prima facie case because he is in the protected class, his conduct was comparable in seriousness to that of Dunn because each was charged with a violation of the Workplace Violence Policy, and Myers received more severe treatment than Dunn. Defendants contend that Myers fails to establish a prima facie case because he has not shown that he and Dunn are similarly situated. Specifically, Defendants contend that Myers and Dunn were not similarly situated because the discipline decisions were made by different decisionmakers, there were different enforcement policies, and different circumstances surrounded the discipline of Myers.

In order for the Court to determine whether Myers and his comparator were similarly situated, the Court "'must look at all relevant factors, the number of which depends on the context of the case.'" Disher v. Weaver, 308 F. Supp.2d 614, 621 (M.D.N.C. 2004), quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 619 (7th Cir. 2000). "Summary judgment for the employer is proper under a discriminatory enforcement claim where the plaintiff has not proffered sufficient evidence that similarly situated white employees were treated more favorably." Gaither v.. Wake Forest Univ., 129 F. Supp. 2d 863, 869 (M.D.N.C. 2000). Although the Fourth Circuit has given little guidance on this issue, it has been noted that "a plaintiff must show that he or she was similarly situated to other employees from outside his protected class in all relevant aspects." Truesdale v. Potter, 2003 WL 1522945, *5 (M.D.N.C. 2003), citing Radue, 219 F.3d at 617; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Additionally, a plaintiff must offer sufficient proof to show that the similarly situated person from outside his protected class was not similarly disciplined for like offenses. Moore, 754 F.2d at 1107-11. While the conduct does not have to be identical, the

similarly situated employee must have engaged in conduct of "comparable seriousness." Cook v. CSX Transp. Corp., 988 F.2d at 511.[12]

Myers and Dunn are not similarly situated because Myers was not only disciplined for a violation of the Workplace Violence Policy, but was also disciplined for insubordination; the incident for which he was terminated involved an encounter with his supervisor rather than a co-worker (as in Dunn's case); and Myers had a prior disciplinary record. Myers argues that he was not insubordinate and he did not violate the Workplace Violence Policy because he "did little more than raise his voice after his supervisor had shouted at him while standing his ground." Plaintiff's Opposition Memorandum at 19. Myers' supervisor, Jones, however, submitted a statement that Myers threatened him and got in his face. Sanders and Van Curen found Jones to be credible. Further, two bystanders gave statements (discussed further below) which provided support for Defendants' decision. One bystander testified that when Jones told Myers to finish his work before break, Myers replied "yeah, yeah, yeah" and a short time later both Jones and Myers got loud. Another bystander testified that the two exchanged heated words, were chest-to-chest, were in each others space, and that the push was to create space.

Myers also argues that the Court should only analyze these two situations as violations of one written policy, stating that both he and Dunn violated a written policy, the Workplace Violence Policy. This, however, ignores that Myers was also found to have violated another written policy - the Code of Conduct - because he was considered to have been insubordinate to his supervisor.[13]

---

[12]It is the task of the Court to assess the relative similarity of conduct or misconduct relied on by the parties at summary judgment. See Moore, 754 F.2d at 1107.

[13]In his opposition memorandum, Myers appears to argue for the first time that Defendants
(continued...)

13

Myers was also not similarly situated to Dunn because their discipline involved different decisionmakers. See Heyward v. Monroe, 166 F.3d 332 (4th Cir. 1998)[Table]; Forrest v. Transit Mgmt of Charlotte, Inc., 245 Fed. Appx. 255 (4th Cir. 2007). Maxwell explained that he determined the discipline that Dunn received. See Maxwell Aff., Para. 6-7. Van Curen testified that Maxwell made the decision regarding Dunn's discipline and Evans (the Human Resource Director for the Southeast region) advised Maxwell on the decision. She further testified that her role was to gather data and submit it to Evans. Van Curen Dep. 9-10. Van Curen testified that Sanders, Lisa Millisor (the Human Resources Director out of Atlanta), and she were involved in the decision to terminate Myers. Van Curen Dep. 11. Myers argues that Van Curen was the decisionmaker because her name is on documents pertaining to the investigation and discipline decisions. He, however, has not pointed to anything that contradicts the testimony of Maxwell and Van Curen that Maxwell made the determination as to the discipline Dunn received.[14]

---

[13](...continued)
retaliated against him or disciplined him in violation of the Workplace Violence Policy because he was the first (before Jones) to go to the Human Resources office to report Jones' violation of the policy. This claim does not appear to be properly before the court, as Myers did not allege a retaliation claim in his Complaint. Further, contrary to Myers' argument, both he and Jones appear to have agreed to go to the office together to discuss the incident. In his affidavit, Myers states "[r]ight after the push, [Jones] said to me, 'Let's go to the office.' I followed him." Plaintiff's Aff., Para. 10.

[14]Myers argues that Van Curen was consistently the decisionmaker because of a document generated during the termination of James Hickson, a black male, on December 2, 2004. In that document, Van Curen wrote: "it is **my** finding that your [Hickson's] actions are in direct violation of our Workplace Violence Policy." Plaintiff's Opp. Mem., Ex. 7 (emphasis added). This disciplinary action, however, was taken after Maxwell left the Company. Myers' termination notice, in keeping with Van Curen's statement that the decision as to Myers was made by Sanders, Myers, and Lisa Millisor, provides that "**we** have determined that the company Workplace Violence Policy has been violated" and that "**our** investigation reveals." Myers Dep., Defendants' Ex. 7 (emphasis added).

Finally, Myers and Dunn were not similarly situated because the different plant managers interpreted the "up to and including termination" portion of the Workplace Violence Policy differently.  Maxwell's practice at EarthGrains was "to evaluate each incident of alleged employee misconduct and determine the appropriate discipline on a case-by-case basis."  Maxwell Aff., Para. 2.[15]  He states that he continued this management practice when the facility was bought by Sara Lee. Maxwell Aff., Para. 3.  Sanders states that Sara Lee maintained a "zero tolerance" policy against workplace violence."  Sanders Aff., Para. 8, 10.  Myers contends that the policies were not different because no written documents support Sanders' different philosophy and Sara Lee has presented no written documentation that Sanders, as plant manager, had authority to change the administration and interpretation of the Workplace Violence Policy.  He has, however, produced nothing to contradict Maxwell's statement that he enforced the policy on a case by case basis after fully evaluating each individual occurrence of misconduct, the surrounding circumstances, the employee's past work history, and company policy (Maxwell Aff., Para. 3) or Sanders' statement that he enforced the policy on a "zero tolerance" basis.

          (2)     <u>Legitimate, Non-Discriminatory Reason/Pretext</u>

Even if Myers could establish a prima facie case, Defendants have articulated legitimate, non-discriminatory reasons for terminating Myers, that he engaged in conduct that was both insubordinate and in violation of the workplace violence policy.  Additionally, Defendants have articulated legitimate, non-discriminatory reasons for treating Myers differently than Dunn.

---

[15]Maxwell states that he determined that termination would be too severe a punishment to impose on Dunn because he did not believe that Dunn sincerely made the threat, Dunn was a good mechanic who had worked at the Orangeburg facility for many years, the incident was between two hourly employees, and the incident did not involve any physical contact.  Maxwell Aff., Para. 7.

Specifically, Defendants provide that Myers' altercation with Jones occurred under the leadership and decisionmaking of a different plant manager, a different department manager, and different approach to the enforcement of the Workplace Violence Policy. Defendants also provide that Myers not only violated the Workplace Violence Policy, but was also insubordinate by yelling at his supervisor and refusing to complete his assigned tasks, while Dunn had not been disciplined for insubordination and was not insubordinate during the 2003 incident.

Myers appears to argue that he has shown pretext because he was not insubordinate and did not violate the Workplace Violence Policy. In support of this he argues that Defendants should not have believed Jones' testimony because Jones pushed Myers and would have said anything to help himself. Myers also argues that the testimony of two bystanders, Dannie Dukes ("Dukes") and Bart Roberts ("Roberts"), supports his position.

Sanders states that he believed Jones' statement because Jones has a history of being honest, and Jones willingly admitted that he made a mistake. He also thought that Jones's testimony was believable because it was supported by Roberts' testimony, and he found Roberts to be a very credible witness because he was an unbiased new employee and had not reason to lie about what he observed. Sanders Aff., Para. 9.

The statements from Dukes and Roberts provide support for Sanders' decision. Dukes, a maintenance employee, completed a statement on June 28, 2005 in which he stated that he heard Jones tell Myers that before Myers went on break, Myers needed to finish his work. Dukes heard Myers respond "yeah, yeah, yeah." He also states that Jones and Myers "were getting very loud and spirited as they were talking" and "[t]hey began to start yelling." Van Curen Dep., Plaintiff's Ex. 2 (Dukes Statement). Roberts, a new maintenance employee, did not know Jones' and Myers'

16

names but described Myers as telling Jones that if Jones had a problem with him to not to discuss it in front of other workers, but to get him to the side. He stated that Jones and Myers exchanged heated words, were "in each others face," and were "chest to chest as they yelled at each other." Roberts also stated that Jones was close to the wall and pushed Myers enough to create space, Jones did not push Myers enough to make Myers fall, Jones and Myers were both in the personal space of the other, and Jones used his hands to push Myers to put some space between them. Van Curen Dep., Plaintiff's Ex. 2 (Roberts Statement).

Here, Myers fails to create a genuine issue of material fact as to whether Sara Lee honestly believed Myers was insubordinate and violated the Workplace Violence Policy. As discussed above, two neutral witnesses stated that both employees were yelling. Jones stated that Myers threatened him and invaded his personal space. Roberts stated that Jones and Myers were in each others' personal space.

Even if Myers was not insubordinate, did not threaten Jones, or did not invade Jones' space, he fails to show pretext as he fails to show Defendants did not have a reasonable belief that this conduct occurred. See Holland v. Washington Home, Inc., 487 F.3d 208 (4th Cir. 2007), cert. denied, __ U.S. __, 128 S.Ct. 955 (2008)(in assessing pretext, a court's focus is on the perception of the decisionmaker, that is, whether the employer believed its stated reason was credible); see also Jones v. Giant Foods, Inc., 2000 WL 1835393 (D.Md. Nov. 27, 2000)(unpublished)(Jones argued that Giant's proffered reason for firing her, that she had stolen two cans of soup, was pretextual because she did not, in fact, steal the soup. "What matters in the Title VII analysis, however, is not whether Jones stole two cans of soup, but whether Giant in good faith believed she did.").

Myers argues that he has shown that these reasons are pretextual because Van Curen was the decisionmaker or at least the de facto decisionmaker for the discipline of both Myers and Dunn. As discussed above, Myers has presented only his own speculation that Van Curen was the decisionmaker for Dunn and has presented nothing to contradict Maxwell's statement and Van Curen's testimony that Maxwell made the decision as to Dunn's discipline.

Myers also argues that Defendants' articulated reasons are pretextual because the Workplace Violence Policy, its interpretation, and its administration did not change over time. The parties do not dispute that the Workplace Violence Policy was the same at the time of both the Dunn and Myers incidents. Defendants, however, contend that the interpretation and administration of the policy changed when Sanders became plant manager. As discussed above, Myers fails to show that Maxwell did not use a case-by-case approach or that Sanders did not use a zero tolerance approach to make discipline decisions under the Workplace Violence Policy.

### B.     Discriminatory Discharge

Myers alleges that he was discharged based on his race in violation of Title VII and § 1981. See Complaint at 3-4. Defendants contend that Myers fails to establish a prima facie case of race discrimination.

Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...."  42 U.S.C. § 2000e-2(a)(1). In the

absence of direct evidence of discrimination,[16] a plaintiff can establish a prima facie case of discriminatory discharge under Title VII by showing: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time the employer took the adverse employment action, he was performing at a level that met his employer's legitimate expectations; and (4) the position was filled by a similarly qualified applicant outside the protected class or other employees who are not members of the protected class were retained under apparently similar circumstances.  Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004).  When a plaintiff makes a showing sufficient to support a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the employer produces a legitimate reason for the action, the burden once again shifts to the plaintiff to show that the employer's rationale is a pretext for discrimination.  Id. at 804.

Defendants contend that Myers fails to establish a prima facie case of discriminatory discharge because he cannot show that he was meeting his employer's legitimate expectations at the time he was terminated and he cannot establish the fourth prong of his prima facie case.[17]  As noted above, Myers has not addressed these contentions, addressing his claims only under the disparate discipline framework.

Myers fails to establish a prima facie case of discriminatory discharge because he has not shown that he was meeting Defendants' legitimate expectations at the time he was terminated.  As

---

[16] Myers has presented no direct evidence of discrimination.

[17] Sara Lee provides that it hired four sanitors: Lennie Battle (black male), Jennifer Hayes (black female), Kim Luebke (white female), and Jackie Shuler (black female) on August 15, 2007. Defendants' Motion for Summary Judgment at 29.

noted above, Myers was disciplined on three previous occasions (by Daff on January 29 and September 24, 2002, and by Jones on July 3, 2004) for failing to properly complete his assigned tasks. Defendants contend that on June 28, 2005, Myers' job performance was not satisfactory because he failed to complete his assigned duties and, when confronted about his poor performance, behaved in a manner which violated the company's Code of Conduct and Workplace Violence Policy.

## CONCLUSION

Based on the foregoing, it is recommended that Defendants' motion for summary judgment (Doc. 30) be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

May 22, 2008
Columbia, South Carolina